Here are the next case, D'Amico Dry Limited. May I proceed, Your Honor? May it please the court, my name is Thomas Tisdale. I'm one of the attorneys for the appellant, D'Amico Dry, in this matter. This is the second time this case is before this court on a dismissal of the complaint for lack of subject matter jurisdiction. Like the first appeal, this is a case of first impression, subject to de novo review. This court should reverse the decision of the district court on either of two grounds. Number one, either by accepting the invitation which the Fourth Circuit put forward in flame and asked this court to review FFAs and determine that all FFAs are maritime contracts because of their salty nature, as the Kirby Court has described it and these subsequent cases in this court have refined it. Or alternatively, that this FFA was a maritime contract because it was entered into by D'Amico Dry, a company engaged in maritime commerce, as part of its shipping business. Either way, the district court's decision should be reversed and remanded. The district court correctly talked about the general principles of maritime contracts, subject matter jurisdiction, and properly quoted Kirby's general principle that the general principles behind it are to protect maritime commerce. Where the district court went awry was when it tried to determine what constitutes maritime commerce. In that instance, Judge Codal looked to, instead of decisions from this court, of which there are many, he went to the Fifth Circuit Court of Appeals in a case called Alphamate. Alphamate was a grain sale, a bulk grain sales case. It had nothing to do with a maritime case or an FFA and was a case that had only a minimal involvement of maritime service. It was the sale of bulk grain. But what Judge Codal did was to grab hold of Alphamate and its recitation of Benedict on Admiralty, which predates Kirby. And Benedict on Admiralty says that a maritime contract must have a direct and substantial link to a ship, its navigation, or management afloat. You talk about Alphamate, and I understand your argument, but aren't there plenty of other points where the district court used the correct standard? The court referenced the correct standard, but ultimately went to Alphamate and made continual connections to the fact that we did not connect it to our physical vessels. We did not use it as a specific hedge for specific ships or contracts which we'd entered into. I understood, and I may be incorrect, that the district court properly invoked the principal objective standard, citing on several occasions Fireman Fund, Folks America, and Kirby. Did it not? Again, the court properly referred to those cases, but when it came to its ultimate application of the law to the facts of this case, it made numerous factual findings that D'Amico did not show that there was a connection to its specific physical ships, that D'Amico did not show that there was a substantial link. There were numerous findings to that effect, a substantial link to a vessel in navigation, et cetera. What the district court did was to accept the definition of the term hedge, which was, as their own experts said, the term hedge has many different definitions. If this court looks to the Fourth Circuit's decision in Flame, you will see that what is generally referred to as the use of an FFA as a hedge is as if it's used to diversify its income. It does not have to be a specific hedge for a specific vessel. You could diversify your income by betting on the price of pork bellies, couldn't you? And the judge said that there's really no particular difference. You were just betting on something that you knew about, your client knew about because it's its business, but that it didn't have any role in controlling its costs or in its operations. But that whole analysis, Your Honor, would ignore entirely all of the elements that an FFA has, which are specifically maritime services. An FFA involves specific types of ships. In this case, Panamak bulk carriers engaged in specific trade routes, which are unique to those ships. When people used to cross the ocean in ocean liners, the passengers used to bet on what day or what time they're going to get to New York or South Hampton. That was not a maritime contract. That was just a bet, and it was very similar to the kind of bet that your client made. If we go down that route, we would be effectively saying all FFAs are non-maritime contracts because in no case has anyone ever required evidence that an FFA is used as a specific hedge. In fact, the Fourth Circuit rejected that argument. If the court directs its attention to footnote nine in the Fourth Circuit's decision, you will see that this argument was raised at that time and rejected. Flame, in that case, could not have been hedging as Judge Cole required because Flame was selling FFA time, but it was a charterer. It wasn't minimizing its risk. It was duplicating its risk. It wasn't hedging. Explain to me. I went through some of these cases trying to figure out what being salty means, and I think I've determined that a contract to purchase a ship is not within the maritime jurisdiction, but a contract to rent a ship is within the maritime jurisdiction. That didn't help me very much. What would be wrong with saying that these are as a category outside of maritime jurisdiction, meaning that they may be in some way related to maritime commerce in the broadest sense, but they essentially are not about ships and their use as such, which is one articulation I ran across. Well, and that's because, Your Honor, the test, as it has been established both in Kirby, because the Kirby court says it need only relate to maritime business, not be directly connected to, and only must relate to or refer to. Now, many cases which may be, or many contracts which might be acceptable or employable in land-based businesses, when employed in the shipping industry now become maritime commerce and maritime contracts, such as in the Williamson case where standard non-compete, non-disclosure agreements became maritime. In this particular case, you have an FFA which has only maritime elements. It involves specific vessels in specific routes at specific times of the year, which then impose specific cargoes in the mix. Does trading in this market have any effect at all on real-world shipping prices? I think it's the other way around. Real-world shipping prices have a direct connection to how an FFA is settled, and that's what the settlement rate is based upon. Could I ask you about the other way? It doesn't have any effect on actual maritime commerce, does it?  I can't point you to specific ones, but there was, in fact, in 2008, there was a great deal of concern about the fact that some of the players in the FFA market were attempting to very much manipulate the physical market as a result. Let me ask you a couple of things just so I can better understand. How long does it normally take to negotiate an FFA from start to finish? It may be. What is the process? I'm trying to understand, for example, the connection between what happened in this case. What I can refer to is my own client's experience, and that is he may come to a determination that he's got too much open time on his future employment of his ships, so he considers whatever his alternatives, how might he be able to hedge that. So he goes to a broker and he says, I'm looking to either buy or sell time. That broker then looks to see who else in the industry may be interested in that same market, and there are contacts back and forth. In the FFA market in 2008, there were a set number of regular maritime players in it, and you will see many of the same names coming about. But there may have been 30, 40, 50 of these players. There were four or five brokers, all of whom were speaking with one another. You would put out an offer to buy time at a certain rate, and the broker would then seek a counterparty. Today that whole process is almost lost a bit because it's no longer over the counter. It's done through clearing houses. Is this a market where there are standard routes, you know, Montreal to Mumbai or Baltimore to Caracas, and large numbers of people are making bets on this as of particular dates? There are particular routes for the vessels. There's a limited number of routes on which you can enter into an FFA. Correct, and that's because those are the routes that physical vessels, those types of vessels ply. Just an example, Panamax bulk carriers come out of the U.S. east coast in the autumn carrying coal to Europe, and they make them out of the Gulf going to China with grain. There are specific routes. These things are usually linked to a limited number of routes for particular kinds of vessels, and many people are making bets on these things at the same time. Forget the word making bets. Many people are entering into FFAs on these same routes with respect to the same times. Some people may be making similar contracts at the same times. Are those contracts made public? Like in paramutual betting, you know what the odds are for each horse. I'm happy to tell you I don't know enough about that kind of betting to tell you, but I'm not aware. The odds are formed by what people bet, so the question is whether, to take my inarticulate question, whether actual prices for shipping of goods on these routes at certain times would be affected or impacted by the published terms of FFAs. No, sir. But on the flop side of that, the demand in the physical market makes the determination as to what the settlement rate will be. So as you're viewing your use of your employment of your vessels coming down the line, you're saying, okay, what's the demand going to be in Q1 2009 on the physical vessels, because that's going to determine what the settlement rate is on the FFA. What is the demand on the physical vessels as established by the Baltic Exchange for those specific routes, which are the routes which those vessels generally ply? So this all connects back to the physical vessel, type of vessel, routes in which it applies, the time in which it's occurring, which determines then what kind of cargoes it's going to be affecting that settlement rate, et cetera. Everything about an FFA is connected to- Correct me if I'm wrong, but your argument is that an FFA, by its nature, is, as you say in the trade, salty, and that, therefore, it was an error for Judge Kodal in the first place to hold a hearing as to what each party intended or why each party entered into it. That would be the first argument. The second argument would be, Your Honor, that following flame, and the court has to review in a bit more detail what exactly is meant by some of the terms that were used, and those are explained in the footnotes very clearly, that following flame, this whole idea of whether we used it to hedge physical unemployment of our vessels against this contract is irrelevant. It doesn't matter. The fact is we are a shipping company engaged in maritime commerce using FFAs in our shipping business, and all of those elements, the salty elements involved in an FFA, combined with that, make this a maritime contract, and, therefore, subject to the court's jurisdiction. So let's say that we assume, just arguendo, just for the sake of argument, that we view your client as entering into the Tsonga FFA and closing out its position as speculation. So your view is that we shouldn't view the Primera FFA, entered into just a few days before, as tainted by that same speculation. Well, first, I would say to Your Honors that there's no thing that ever said, you know, first, everything in shipping is speculation. Ship owning is speculation. These people don't build a ship and then shorter it out for the next 10 years on a fixed contract. They send it out for two weeks, two months, six months, et cetera. They're working to market everything into speculation. But in terms of the Tsonga FFA, first of all, if it's a maritime contract, it's a maritime contract. And the second contract — You just look at the first contract, and you don't look at anything that comes after. Well, I would say to Your Honor that, number one, you don't have to because it has all of the salty elements necessary. But, number two, if — Could you? Could you? Could we look at the Tsonga contract? Yeah. Under other circumstances where you would look at a subsequent contract in relation to the first contract? There has never been an instance in maritime law where a second contract is made non-maritime because one has entered into a contract later. Many cases — Could the first contract be made, in essence, non-maritime because of what happens after? Nothing that I'm aware of, Your Honor, in terms of contracting with a separate party. I'll give you an example in that, if I may. There were many companies, and in 2007, 2008, and 2009, there were many, many companies that were chartering in ships and chartering them out immediately, just making money on the difference in the rates. They didn't operate the ships. They didn't provide cargoes for the ships. They didn't provide any services to those ships at all. They just entered into one charter party and followed it by another charter party, many times in the same day, because their markets were fluctuating that dramatically. The second charter party doesn't make the first charter party any less maritime. There's nothing in that that would happen. There is no instance where a second contract makes a first contract non-maritime. But to follow that point through further, Your Honor, if everybody did what they were supposed to do, if Primera had, in fact, paid, D'Amico would have assured itself for Q1 2009 a profit of $81,000. That's certainly a hedge against the potential falling market on its physical market. It was used in its business as part of its maritime business as another method of managing its risk. One more instrument, just the same as it enters into contracts of a freightment, voyage charters, future charters, time charters, long-term charters, charters in tonnage, charters out tonnage. It's one more tool with all of the elements of a charter party with the exception of a specific ship. So let's say that you have one party that enters into the contract for all the appropriate reasons that we would say that a maritime contract obtains, but the other party doesn't. Does that matter in terms of whether we have jurisdiction? I think Your Honor would find that in every case where the party, the other party, has contested there being subject matter jurisdiction in maritime law would contend that that was not my intention. In fact, in Folks America, the insured said, no, no, I didn't think this was going to be a maritime contract. I had no intention of entering into a maritime insurance contract in my CGL policy, but this court found that it was a maritime contract, and the maritime obligation of utmost good faith now applied. Certainly, the insured said, well, that wasn't my intention. I didn't think that was going to be what happened here. That happens, I believe, Your Honor, in every case where there's a contest on the issue of maritime contract subject matter jurisdiction. And if you have, let's say, FFAs that are contracted between two non-shipping companies, that they could still be maritime contracts or not? I would submit to Your Honor, as I believe I said at my opening, there are two ways that I believe this court can reverse the district court. I think there are sufficient maritime elements such that even those FFAs could be deemed to be maritime. However, you don't even need to go that far. So that was the invitation that Flame left open, and Flame talked about the fact that they didn't enter into them as mere financial speculators, like, for instance, Morgan Stanley might. Realizing that we don't have to go that far for your client to prevail and that you don't have to make this argument, is there any reason to go that far? I mean, is there any reason to say that two non-shipping parties, that there's something about these contracts, that there's a policy reason, any reason they should belong within maritime jurisdiction? I don't know of any particular reason they need to go that far in FFAs, Your Honor. My concern is this. There is a conceptual view to maritime contract subject matter jurisdiction. If we create boxes that we're just checking off, we're reverting back to the spatial approach. We're supposed to be looking at what's the nature of the contract. Does it relate to maritime jurisdiction? And not so far, not always, just in the case of an FFA, but there are going to be countless new contracts coming into place as the new technology is put into place, which is exactly what Justice O'Connor was speaking about when she talked about the need for the expansion of the conceptual view of maritime subject matter jurisdiction. So that's my concern about it. I believe I'm out of time. Thank you. May it please the Court. My name is John Riley, counsel for the Appalachian Primera Maritime. The district court, I think the primary finding and conclusion, the most important of the findings and conclusion by the district court is finding 23, where the district court stated there is no credible evidence that the plaintiff used the D'Amico Primera FFA or indeed any of its FFAs to hedge its shipping business or to protect its physical shipping positions in any other way. And what the district court was doing there was playing off the instructions from the Court of Appeals in Kirby, where Kirby teaches us, as does Firemen Fund in this circuit, as does Folks America in this circuit, the analysis should be to whether the contract that allegedly creates maritime jurisdiction, whether the intention of that contract is to protect maritime. Would you concede that many or most FFAs are salty? I would not, Your Honor. I would not. You think it's basically bets made by two companies that are kind of in the business and have a hunch as to what the rates are likely to be in the future? Our expert, Ms. Albers, testified and it was cross-examined by counsel with an affidavit that she had submitted in the Flame case when she testified in that case. And that actually shows, that affidavit, that back in 2008 and 2009 when this market was so hot, the FFA trade worldwide, the global trade, was about $125 billion, almost as much as the physical trade, which was about $150 billion. And the point of that is it's very clear that people around the world, including my client, who didn't own those types of ships or didn't own any type, they were betting in this market, that is the FFA market, simply as a bet. It had no— on a certain route two months from now. They actually hedge and they win on that. They end up with the counterparty having to pay them money. According to Judge Kodal, they couldn't collect on that contract until they had a hearing as to whether one party and or the other party have formed intentions to hedge. It would be, in a sense, an unusual contract. It wouldn't be enforceable in the court in which it arguably should be without detailed hearings as to why people entered into them. Let me say first, Your Honor, it's not so much that a party wins when they take the bet. If they're really hedging— They make money on the contract. In my view, they win. If they're really hedging, what they're doing is they're offsetting the loss in the physical market. So will they offset their loss? They lose on the actual transaction and they win on the hedge. They win on the hedge. Exactly. And now Judge Kodal isn't saying that—I believe he mentioned in the record, look, if this is not a maritime contract, bring the action in New York Supreme. You don't have to come into federal court and prove it's a maritime contract to collect on an FFA agreement. But if it is a maritime contract, it would, under Judge Kodal's analysis, be essentially unenforceable in the admiralty court because collection of it would be subject to fairly extensive discovery, testimony, findings, and delay. I don't follow that because if it is a maritime contract or if the plaintiff wants to allege maritime jurisdiction, that's where we are. They have to come into the federal court and show that within the meaning of Kirby and Folks America and Fireman's Fund, this is a contract that we entered with the intention, if someone's not paying, we entered it with the intention of protecting our physical maritime— Yeah, I'm just saying, you not only have to show the contract and how it came out, but you have to show what your intent was in entering into it. To have maritime jurisdiction. Right. But if you— Doesn't that, following up on what Judge Jacobs has said, doesn't that involve extensive jurisdictional discovery and maybe a bench trial before proceeding? If someone is challenging the jurisdiction of the court, yes. But that's true in so many cases, so many other issues. But isn't it—it's a little different than—I agree with you. Many times you have to do a jurisdictional inquiry, but in a contract action, you usually aren't asking about the intentions of the parties in entering into the contract. It's a preliminary question to the jurisdiction over the court. That feels unusual. Well, here's the other—back this up the other way. If it is a maritime contract and someone has entered the contract who isn't involved in maritime shipping at all, and we make the point in our brief that all of our major trading partners around the world, none of them treat these as maritime contracts, but if a fellow in Australia or China or the U.K. gets involved in one of these contracts and he's being brought to the United States as a defendant in an action, it seems to me there should be some showing that this has maritime jurisdiction. That's not—I don't think that's too much. You just said that these contracts are treated around the world as though they do not have— they are not maritime contracts. That's in your brief. Yes. Well, in England, Australia, there's a very well-reasoned decision. In China, there's a decision. There are no decisions going the other way. But here's—I want to back up as to where—how the case law in this circuit got to where it is right now. Because counsel's been talking about 2007 and 2008 and 2009. They were pivotal years for this market. And in 2007, in the Southern District, we had the Brave Bulk decision, which plaintiff is relying on extensively and which we submit. Judge Kodal distinguished completely four or five of his findings. And what the Brave Bulk decision—the facts of that case are different than this, but the teaching of the Brave Bulk decision in 2007 said, yes, FFAs can be maritime contracts when they are entered into for the purpose of, I'll say, protecting physical assets or hedging. She used—the judge used the word hedging. In 2008, the next year, we had the EFCO decision. And the EFCO decision—just to record again, but the EFCO decision held that it's not enough for the contract simply to refer to ships and voyages and trading routes. This is, I believe, the EFCO decision from the same judge that wrote the Brave Bulk. It has to do more. It has to—there must be a direct and substantial link between the contract and the operation of the ship. It's navigation or management of float. And then, finally, in the following year, 2009, we have the Indargo decision. I mention those three decisions, district court decisions, because it tees up what happens in 2010. And it tees up why I think the district court judge found the only witness that testified on behalf of a plaintiff with respect to the intent of entering this contract. The only witness was not credible. And what happened in 2010, those three decisions now have been issued by the district court in Southern District. In comes the plaintiff. In support of their case, they submit two declarations, the original declaration before his deposition and his first deposition, then a supplemental declaration. And the two declarations were in the appendix when this case was last before this court. And this court, in its first decision in this case, recites a narrative, obviously based on either the district court's decision or those two affidavits, which went on about how this particular plaintiff was using these contracts in his shipping business and to protect his position and to protect his risk of unemployment of his vessels. That turned out to be all untrue. None of that was true. When the district court, after trial, after cross-examination, realized, partly because of the contract that was entered into two days after that Chief Judge Katzman referred to, realized it was untrue, then he said, there's no credible evidence here to suggest that the plaintiff was using what it was. I understood you to say that your brief makes the point that foreign courts and foreign countries routinely view FFAs as non-maritime. I didn't say routinely, but I said the holdings there in those . . . I don't even see any foreign cases in your table of authorities, and I don't . . . I'd be curious. I mean, most of these contracts would be made internationally, so you'd assume that there'd be quite a lot of it. I think you're on page 21. Is that what you're referring to? I have it. Yes, the Australian case . . . Thank you, Your Honor. Thank you. I just . . . I didn't know what you were referring to because I didn't see it. It should be in the table of authorities. Okay, yes. Yes, the English law is pretty clear. In fact, the last time this case was in front of this court, it was because the district court had found that pursuant to English law, there's no maritime jurisdiction here. But in any event, the two declarations are submitted. This court sends the case back to the district court on the issue of whether it's U.S. law or English law that applies. We go back to the district court, and we make another motion to dismiss because our view is that those declarations and the deposition testimony are insufficient to create . . . to help the plaintiff meet his burden of proving that maritime jurisdiction. We think they're bold statements without sufficient support, without corroboration. They're inconsistent. But the judge, the district court judge, looked at it and said, there is a question of fact here, a material issue of fact, as to whether they were using . . . whether the plaintiff was using this contract to protect its maritime assets or to hedge against the risk of unemployment. So it was really the reverse. He was concerned whether they had made that showing. We had the trial, and after the trial, very clear that those affidavits were not correct. There's no credible evidence that they were using it as they say they were using it. We say they were only using it to bet. And it seems to me fair to say that before this court, the plaintiff, the appellant, has raised the issue this way. The first point in the appellant's brief says, is it salty enough? Is all . . . look, we've made reference to maritime activity. The contract makes reference to voyages and ships and such. That's all we need. That's clearly not the case. That's not the case under prior law in the district, in this circuit, and in Kirby. Because Kirby, Fireman Fund, and Folks America make it clear it's not merely a reference. It's not merely a reference to maritime activity. There has to be some showing that the principal objective of the contract . . .  Well, let's say that you have, you know, let's say D'Amico or substitute any other name in a similar position. Simply, you know, let's say it just changes its mind about market conditions after entering into . . . The question is, why should that mean that the Primera FFA, although it was, you know, arguendo, a bona fide hedge at the time it was signed, is no longer a maritime contract? Yes. That is not our . . . you know, seven months later or whatever. It's not two days later. Does that, you know, help me understand? Yes, Your Honor. Thank you. We don't contend that the Sangha FFA somehow transforms a maritime contract into a non-maritime contract. That's not the key to the Sangha FFA. What the Sangha FFA goes to is the credibility of the witness. We deny that there's any evidence that there was ever any intention that the first contract was a maritime contract. We say there's no evidence of that. In fact, we say all of the preponderance of the evidence, as the Court found, is that it was not a maritime contract because there were eight contracts during the relevant period. Four were . . . they were going long, we'll say, to use the trader parlance. They were buying and four they were selling. And all of those contracts show a pattern of speculation. And the judge found that this contract nor any of the other FFAs were used to protect the maritime business. So now we come back and we say, yes, we have that September 2nd, the first contract. And we say, is that a maritime contract or not? Well, what's the evidence? We have the testimony from someone, but it's false testimony. And so there's no evidence that that's a maritime. They have a document that refers to shipping and refers to voyages. But as the Kirby case said and as EFCO has said and Fireman's Fund, there needs to be a showing that the principal objective of this contract is to protect a maritime business, maritime commerce. And maritime commerce is something that relates to the operation, navigation, or management of a vessel of flow. That's the quotation from Alfame and from Benedict, but also from Schoenbaum. Now, Schoenbaum, respected authority in this field, cited by the Supreme Court in the Kirby case. The 2010 edition of both, actually both Schoenbaum and Benedict, defining a maritime contract, define it as a contract that relates to the operation, navigation, or management of a vessel of flow. That's maritime commerce. Before this, we're trying to figure out whether the contract itself has a primary objective of protecting maritime commerce. These efforts, and I don't want to argue more than I need to argue, but these contracts do not have that as their primary intention. Certainly, there's no evidence that the contract in this case, the primary contract, had a primary intention of protecting maritime commerce, which is the operation, navigation, and management of a vessel of flow. And with that, Your Honor, unless there are other questions. Thank you. Just a few points, Your Honors. First of all, when it comes to this idea that there must be a connection to a ship of float, that is precisely contrary to the holding in Kirby. In Kirby, Justice O'Connor says, to ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in a dispute, as we would in a putative maritime tort case. That's exactly why this Benedict comment doesn't apply. Yes, it may be maritime if there's a ship involved, but it may not be maritime if there's a ship involved. And it may be maritime even if there is a ship. It may be non-maritime even if there is a ship involved. Could you say to your adversary's argument that in other, I mean, these are all international transactions, and that worldwide, FFAs are viewed categorically as non-maritime? Thank you, Your Honor. In fact, I was going to bring that up. Three points on that. First, the first appeal in this case, in which Judge Katzmann was a member of the panel, specifically held we cannot look to foreign courts to determine what our subject matter jurisdiction is. And that's one reason why. Number two, a unique factor in American maritime jurisprudence is the Rule B attachment, and that our maritime jurisdiction is common law, not statutory. All of these other courts, it's statutory. It doesn't matter in England, for instance, whether you're in the admiralty court or the commercial court. You don't have any other additional remedies. You don't get any additional benefits by being in the admiralty court or the commercial court. It makes no difference. But here in the United States, we're the only country in the world with a Rule B attachment, where I can attach a third party's assets because I have a maritime case against them, and they're not subject to jurisdiction in the court otherwise, but they have property here. We're the only ones who have that. So we have this whole common law concept of what constitutes a maritime case. Otherwise, it wouldn't matter. It would make no difference at all. But to us, it's a very grave difference. Everybody worldwide who wanted to enforce an FFA would want to come right here. New York. If you have personal jurisdiction over a defendant or property here, you might, Your Honor. Yes, you might. And the same as we do with many other contracts that other jurisdictions don't deem maritime. England does not deem maritime insurance contracts maritime. You know, every court has its own specific references or reasons. They deem a ship's sail contract and a ship's construction contract maritime. We do not. We have specific reasons for ours. They have theirs. But we do not look to foreign law to determine our court's, this court's, subject matter jurisdiction parameters. On the issue of ‑‑ sorry, there is no other contract in maritime jurisdiction or anywhere else that I'm aware of where the intention of the party is an element in determining whether or not there's subject matter jurisdiction. I can think of no other contract in maritime parlance or anywhere else where that is a factor or a function of it. Counsel made reference to brave bulk. Brave bulk does not require that there be evidence of a hedge. Brave bulk does not require that the FFA be used as a hedge. It talks about the fact that a use by ship owners is to use it as a hedge to protect against fluctuations in the future. That's not a requirement. No court's ever so held. And, in fact, the flame decision specifically rejected that kind of an analysis in the Fourth Circuit. If we follow, as my colleague would contend, that all FFAs are non‑maritime, we would not only be overruling all the prior decisions before it, but we would be coming up with a decision which is contrary to the Fourth Circuit's decision in flame, which specifically held that FFA was a maritime contract. The discussion about cases such as EFCO foods, indigo, et cetera, are all like alpha mate. They are all grain contract cases. They are all the sales of pig iron, grain, iron ore, bulk cargo contracts where there's a very minor shipping relationship. FFAs are not like bulk sales contracts. FFAs, for lack of a better term, are watered down charter parties. They're a charter party without a specific ship. All of the obligations follow. Thank you. Thank you. Thank you both for your arguments. Are there any other decisions?